May I be excused, Your Honor? Yes. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. May it please the court. McKelvey. Good morning. Rod McKelvey and Jason Fowler for Deering Company. I'd like to focus on the filler plates, which are 86 and 88 in Figure 1 of the preferred embodiments. Those filler plates, we think, show good reasons why the trial judge was wrong, both under literal infringement and undocumented equivalence. If you look at the specification at Column 3, Lines 3 through 7, they show us that these filler plates connect the upper and lower decks. If you look at the specification at Column 4, Lines 28 through 32, they show that the filler plates serve the purpose of the patent of obtaining torsional strength of the box. This suggests to us that the inventor knew that an indirect contact between the upper and lower decks would serve the purpose of the invention and should fall within the scope of the claim of the patent. What does engaging mean? Well, the parties at least agree that it meant contact. We obviously believe it means direct or indirect contact. And so we can look to the filler plates as saying that... I can engage you in a conversation or engage Judge Newman without touching her, can't I? Yes. Why was this viewed narrowly? By the trial judge? By mistake. Do we need to go to doctrine of equivalence on this case? You don't need to go to doctrine of equivalence. We'd like to go to trial on both literal and doctrine of equivalence, but you don't need to go to doctrine of equivalence because I think it's correct that you can construe engagement as being direct or indirect contact. I'd like to discuss this vitiation defense, which is actually just a re-performance of the doctrine of equivalence analysis itself, isn't it? I think it is. When you're analyzing the doctrine of equivalence, you look at a missing limitation and see if that missingness is substantial. You do the same thing in vitiation, don't you? I agree. Why do we have a defense which mirrors the test? We'll hear, I guess, from opposing counsel. I'm just not sure why we have it as a matter of law. Well, it's interesting that we convert the factual test of equivalence into a legal test for vitiation as a defense, but why are we doing this? I guess it must be related to the concept of binary. That is, there may be certain terms in a claim that don't have an equivalent, but that's not the case here. I mean, I think those cases are very isolated. So you're talking like the Moore case, majority and minority. Correct. A minority can't be an equivalent of a majority by definition. That's right. But that's saying the doctrine of equivalence isn't met, not that there's a defense of vitiation, is it? I guess that's correct. You're saying that no reasonable person could have found that a majority equals a minority. That's correct. Or the other classic case in this area is the before and after, isn't it? Yes. You can't have a before that equals an after. I agree. Sounds like a discussion between my wife and myself, right? Yes, yes, yes. I guess you and I are agreeing a lot, but I do want opposing counsel to hear all of this because it gives them a lot to answer for, I think. If there's one point I could make about the filler plates, it is that the defendants argued, at least Bushhaw argued, that there was no literal infringement with the filler plates. And they said the reason is because the claims should be interpreted as requiring that the filler plates, that the contact take place where the upper deck is sloping. I'd just like to note, we did not mention this in our brief, but if you look at column 2, line 46, it shows the central portion of the upper deck, that is number 64, is in fact convexly bowed from front to rear. So that says that the filler plate is connecting the upper deck and the lower deck at a point where the upper deck is sloping. And it's actually confirmed by column 3, lines 3 through 7, which notes that the filler plates are themselves sloping. Let me be sure I have a few factual issues correct. As I understand it, first of all, I find the terminology in this case wonderfully interesting. For example, you refer, the patent refers to lower and upper deck walls. Correct. But it doesn't really mean walls, does it? It means upper and lower, essentially horizontal decks, right? Are they called deck walls? I think we could probably assume that it's part of the industry to call them walls, but I agree that it's a little unusual to see it as a wall. It talks about them as a box, too, and I don't think it's really a box. One would hope their engineering was better than their labeling. I know, John Deere's engineering is terrific, John. Let me ask you this. You take the upper deck wall and the lower deck wall, and in the illustrations in the patent, in the diagrams in the patent, my assumption is that, and the trial court's assumption seemed to be, that the front and back of these decks were fastened together the entire length of the front and back. Is that your understanding? That's what the trial judge assumed, correct. And maybe I have to ask them this question, but my assumption is that their filler plates, or whatever you want to call them, did the same thing. That is, they weren't just periodic strips attached to the upper and lower deck walls, but they were longitudinal strips that went the whole front and back. My understanding is they accomplished the same purpose as the welding that was otherwise described. Well, you could accomplish that same purpose by nuts and bolts with spacers, or you could accomplish them with periodic welded strips, and I'm trying to find out whether, in fact, the accused devices were welded front and back. From left to right. From left to right, the whole length of the strip. Do you know that? I'll rely on defense counsel to confirm one way or the other. My impression from the drawings is that they were... So that they essentially performed the same function. Well, we think they would perform the same function whether they were continuous or not. That is, I don't think there's anything in the claim that requires... That becomes more a question then of, well, it may or may not be literal, but it certainly would raise the question of doctrine of equivalence. Well, it could be literal without a requirement that it be running the full length, because I'm not sure that's in the claim itself. I didn't see anything in the claim that said it had to be welded the whole length, but I'm just curious as to whether the understanding in the litigation was that that's what we would deal with. I didn't see anything in the claim, and I haven't seen any argument on that one way or the other. All right, thank you. The defendants did argue, actually, Bushog also argued, that one reason why we can't rely on the filler plates for the purpose of seeing literal infringement is that the court construed the claims to require that the engagement take place at the front and rear of the upper deck, which is what you described. But I don't think that's part of the court's claim construction. That is, I don't think the court actually reached that issue one way or the other. The court was just describing what, in fact, the infringing products did. Now, Claim 10 talks about engaging and welding. It does. That seems to, indeed, require this connection, doesn't it? Actually, it seems to require it. There's nothing in the record about it, but I believe that there is some. So if you're welding, you've got to connect them, don't you? Actually, I was going to say, that's not necessarily correct. That would connect? Well, that's interesting. I've seen some case law, and I actually participated in some cases where there's some standards about how far apart the metals need to be to be welded. And so it doesn't mean necessarily they have to be touching. But our point is they are engaged. But the welds will cause them to be connected, right? Correct. They're engaged, and then connected or secured. So the point would be that Claim 10 seems to require this direct connection. So engaging in Claim 1 would be broader, since it doesn't include the welding. Agreed. Sounds like Defense Counsel is going to have a lot of questions. Why don't we go to them? All right, thank you. If you're ready, Mr. Shelby. Mr. Martin. Yes. May it please the Court, my name is Craig Martin. Just logistically, I have 10 minutes for argument and intend to address the appellee's plural position. That's your problem. Engaging, why does that require connection at all? OK, I think where you start, where I start with engaging and why it requires connection is specifically in the claim language of Claim 1. And the claim language of Claim 1, if you turn to it, and I'll just read it and explain to you what our view of it is. When it says, front and rear portions respectively sloped downwardly and forwardly, and downwardly and rearwardly from said central portion into engagement with and being secured to said lower deck wall. There are two terms there, into engagement with and being secured to. Commas were added during prosecution in order to survive a rejection of the patent. In terms of... ...and shake it, I would be engaging him and I would be secured somewhat to him and his domain, but I don't think I would be touching him. Engagement for purposes of this patent and this language in terms of describing it describes both a physical and a mechanical relationship. It doesn't describe the function of the patent as the appellant contends. And there are two terms that are being construed here. And you go back to fundamental claims construction. Every term needs to have its own independent meaning, right? The one term... Well, that's one phrase that we hear, but that's like saying, God is good. That's a phrase that gets argued about all the time. But when a sophisticated party... It's true. Yeah, but when a sophisticated party like Deere is drafting a patent, words have meaning and each word has to have its own meaning. Let's look at those 1, 2, 3, 4, 5, 6, those seven words, into engagement with and being secured to. And let's pick up on the concern that Chief Judge Rader obviously has. By the way, if he's engaged to Judge Newman, that would be different from engagement with. In the former case, he would presumably be secured to. But let's worry those words a little bit. And would you tell secured was added at the examiner's request? Is that right? The commas in between into engagement and being secured to were added to indicate the effortness of those terms. Oh, I'm sorry. No, that was fine. Okay. As I understand it, the parties are in agreement that being secured to is understood to mean a physical attachment. The parties are in agreement that it's a direct or indirect physical attachment. It could be direct or indirect, indirect meaning either the two decks are actually touching or they're connected physically with... Say a bracket. Say a bracket or whatever. Or whatever. What does into engagement with add to that understanding of the phrase because it's and secured to? It doesn't say or secured to. It says into engagement with and being secured to. What does the phrase into engagement with add to and being secured to? It adds contact. What? It adds contact. Contact? Contact. More than being secured to? Correct. Otherwise, they're exactly the same. Otherwise, those two phrases are exactly the same. It needs to mean something other than being attached to. So it doesn't mean a bracket attaching two things. So when you look at it and you look at the patent, it's describing a downwardly sloping upper deck, as you said horizontal, right, to a bottom deck that is basically flat those are being engaged to one another, engaged with one another. We also know that they're attached to one another. Being engaged... Being engaged to... Means they're in contact with. Right. Either directly or indirectly. It means they're in contact with. It actually means... Directly or indirectly? No, it means contact, actual contact. Physical contact. Physical contact. Then what does being secured to add to that? Being secured to gives you, explains how things can be, how things might be secured. So you can have indirect secure, you can be directly or indirectly secured. So in describing the universe of what it covers, what this is describing is two decks coming into contact with each other and being secured to, presumably in order to perform the, you know, general functions of the patent. I would have thought secured to just adds permanence to the engagement. Not only are they engaged, but they're permanently engaged because they are secured. So I don't have to have contact to give meaning to both words. Secured and engagement. Engagement means there's some interplay and that is permanent because they're secured in that engagement. I have not brought them into contact and given meaning to all the words. Your response? Yes. The, in terms of the physical description in the patent describes engagement in terms of a sloping deck where it's sloping into one another. When you look at the patent and you look at the function of the patent and how it works, it is designed to do two things, right? It's designed to keep water and debris out, physically secured to, keeping things out. And it's designed to add torsional strength, being secured to and connected to. Not, as you said, not engaged to in some generic type of way. I think you could do that just fine by adding a connector that connects, thereby engaging and securing. And I think that would be literally within the words of the language, would it not? I would then have them engagement with and I would have them secure because I have a connector in between. Much like the filler plate, which they show how they have a connector working. But a connector just... Much like claim 10, which welds them as the connector rather than the broader language of claim 1, which doesn't use welding. Well, just stay on claim 10 for a second. There's about four problems there that you have with the way the district court handled this case, aren't there? Well, I don't know that I count four, but I'll try to keep up with you. I was counting and I'm up to four. Okay. With regard to the claim 10 issue, it's engaging, meaning being welded. It doesn't exclude other types of direct engagement. With regard to what I understand is your point, I can be attached to or engage with in some physical fashion that doesn't require direct contact. Because I have a connector in between, like the filler plate. But you have the being secured to takes care of the connection, directly or indirectly. So what would have happened if... What would be the difference if claim 1, for example, said downwardly and forwardly and downwardly and rearwardly from said central portion, talking about the upper deck, being secured to said lower deck wall, i.e. leave out the phrase into engagement with. And it simply said being secured to. Well, I think... Is it then the case that you would lose because being secured to means direct or indirect by admission of both parties, I take it. Yeah, I think that's right. So you're suggesting that the addition of the phrase into engagement with somehow destroys the meaning of being secured to because it requires not only being secured either directly or indirectly, but absolutely directly. In contact with. That phrase into engagement with adds a direct requirement and undercuts what is meant by being secured to. I'm having trouble with that because as an old property lawyer, I'm used to seeing documents that use three or four or five phrases to mean exactly the same thing. For example, you often see the old deed saying I hereby convey and deed over to and so on and on and on. They all mean the same thing, but they're all different words. Now, we're doing better these days. We use one word, convey, because we, you know, we're paying by the word. But you're suggesting that the phrase into engagement with destroys half the meaning of being secured to. Can you explain how that magic happens? Sure. I think I can. In terms of your property law analogy, look, what the goal is, right? The goal is that Deere's written a patent using some words. They tried to get it through the office once. They didn't get it through the office. The relevant change here was two commas that were added. At the district court, Deere suggested that you construe this whole phrase together, the whole seven words, right? Then when you construe both of those terms and you try to give independent meaning to both of those terms, I wouldn't use the phrase that it destroys half of the meaning. I'd use the phrase that it further defines what they are patenting. It's a practical matter. It narrows the meaning. In terms of the dispute between the two parties, it means that they can no longer sue for indirect contact. They can only sue for when the two plates actually are touching it. Are touching it and are fastened to one another. Let me ask you one further question on that same thing. What would happen if in the manufacturing process, I assume that these are basically stamped steel plates, however, right? Good assumption. What would happen if in the manufacturing process of the lower, what do we call it, the lower deck wall, it was made with, in one sheet, with a bend at each, at the front edge and the back edge of about an inch or an inch and a half vertically and the upper was then welded to that bent up edge. That would meet the trial judge's requirement? It would certainly meet contact and engagement. Right. It would certainly meet that. So the difference then between your fuse device and that device would be that the bent up pieces were separately made and welded to the lower deck rather than simply bent up in one piece. There could be a number of ways to do that. But going back to... Mr. Martin, your partner has two minutes. Do you want to give him any time? Yeah, going back to the fundamental question that I think you're really addressing, Chief Judge Rader's point that being secured to means indirect and direct attachment, right? The parties agree to. That covers your hypotheticals about engagement being like this as long as they're attached to. Being secured to covers those types of things. In order to give into engagement with meaning that is separate and apart from being secured to, which the patent office in approving the patent clearly wanted those two terms to be construed separately, you have to read this differently. And that's why we suggest that it's physical contact. And that's why the district court did so. Because if you don't do it like that, then you don't separate those two terms into independent, different meanings. Now, it is not, you know, in terms of the property law analogy, Judge Plager, the property law analogy, obviously, the parties are using words for a reason. Obviously, JIRA wants a broad interpretation. And we want an interpretation that is consistent with what the total scope of all the prior art is, right? So words actually matter and the commas matter. And finally, Chief Judge Rader, I want to address your vitiation point because I've recently read your In a Nutshell book. It's very good on this point. The claims construction, if you agree with us with regard to the claims construction, and if you agree with us that contact is required, then you fall directly into a situation in which the claims construction specifically excludes the other product. So you get to a point where you are essentially taking equivalence as a matter of law, which you suggest in your outline. Isn't there a distinct difference between before and after one excludes the other, but engagement, that we've discussed has a wide variety of meanings. Why wouldn't that allow substantial engagements, equivalent engagements, whereas before and after I can see one excludes the other. That doesn't apply in engagement, does it? Simply put, no contact cannot mean contact is the way I would formulate it. But it doesn't say no contact. It says engagement. But the construction of it goes to contact if you agree with the district court's construction of those terms. And with regard to substantial differences or insubstantial differences... But see, that is just reapplying equivalence. All you're doing is saying we're going to define our entity in a way that does not allow anything other than a single entity to fulfill the definition. But the doctrine of equivalence by its nature says that take your definition and you can allow it to not be satisfied if the accused product or process is an equivalent, is close enough to be blunt. That is perfectly allowable with engagement whereas it may not work with before and after. So your argument is not convincing. You're just defining your claim term in a way that you think precludes equivalence. But it doesn't. Equivalence applies to any limitation. You can't define it away. So can I respond? Please. With respect to... There's two points. With regard to claim vitiation, if it renders the claim and the claim construction meaningless, then I believe claim vitiation applies. The second point is with regard to equivalence... But you don't do that by defining it as you wish. See? Equivalence requires you to think a little broader than that. If you... The second point, if you look at equivalence and you look at the record that is before the district court in addressing that point as part of claim vitiation or as part of doctrine of equivalence independently, the record has no evidence with regard to the insubstantial differences. The only evidence was a declaration that the district court excluded because it found it conclusory... I think that's a principled argument. ...under an abusive discretion standard. So they don't have... That's a principled argument. You've got a record problem and I think that's very acceptable. So they don't have a record that allows you, this court, to get to that point because they don't have the evidence in the record to go to substantial or insubstantial differences. So if you come back to me on claims construction and I know I'm clearly dealing with a cynical court today. Well-mean, but cynical. When you come back to us on claims construction, I would urge you to take a look at the briefs and give it a fair read in light of the record. Thank you. Thank you, Mr. Martin. Sorry, Mr. Brown, that we weren't able to hear from you. Mr. Kelvin. Just two quick points, Your Honors. First of all, back to the filler plates, they do show, they demonstrate the indirect engagement. That's why I think it's significant that you can't just hold indirect on the side of secure, that it may well belong on the side of the engagement. And then second, as we know, the parties never got to the issue of the merits of doctrinal equivalence because the motion for summary judgment was we were precluded from proceeding with doctrinal equivalence. So we don't know what the evidence will be on doctrinal equivalence. So we know, but it's not in the record. Did you file cross motions for summary judgment? No. No, you did not. You just won a trial. You won a trial. Thank you. Thank you. All right. We're through. Thank you. Thank you.